## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LAVERN BESS,** | |
| **Plaintiff,** | |
| v. | **Civil Action No. 19-3152 (JEB)** |
| **DISTRICT OF COLUMBIA,** | |
| **Defendant.** | |

### MEMORANDUM OPINION

Plaintiff LaVern Bess works at the Correctional Treatment Facility for the District of Columbia Department of Corrections.  She brings this suit against the District alleging that DOC treated her shabbily in retaliation for her efforts to expose discriminatory behavior and separately failed to accommodate a disability.  This retaliation, according to Bess, has taken the form of denials of overtime opportunities, delayed promotion, and a hostile work environment, all in violation of Title VII and the D.C. Human Rights Act.  Bess also alleges that the District violated the Rehabilitation Act when it denied her reasonable request not to be assigned to work around inmates who might have COVID-19 because her diabetes puts her at increased risk of severe symptoms.  The District now moves for summary judgment on all four of Bess's claims, and Plaintiff cross-moves for summary judgment on the Rehabilitation Act count.  Concluding that Bess's evidence is insufficient to create a genuine dispute of fact on the delayed-promotion and hostile-work-environment retaliation claims, the Court will grant summary judgment to the District on those counts.  The remaining two — the denial-of-overtime and Rehabilitation Act claims — may proceed to trial.

1

## I.      Background

As the relevant facts are discussed in detail in the forthcoming Analysis section, the Court here broadly outlines the background to the suit.  Bess works as a correctional officer for the D.C. Department of Corrections at the Correctional Treatment Facility.  See ECF No. 23 (Amended Compl.), ¶¶ 16, 30, 34; ECF No. 28-1 (Def. Statement of Material Facts), ¶ 1; ECF No. 29-3, Exh. 1 (Pl. Interrogatories Responses) at 3.  She previously worked for the District from 1992 until 1999.  See Am. Compl., ¶ 29; Def. SMF, ¶¶ 2–3.  During that time, she was "a class member and active participant" in a lawsuit that "involved claims of systematic sex discrimination within the DOC."  Am. Compl., ¶¶ 18–19; see Neal v. Director, D.C. Department of Corrections, No. 93-2420, 1995 WL 517248 (D.D.C. Aug. 9, 1995).  The parties in that case ultimately settled and entered into a consent decree.  See Am. Compl., ¶¶ 21–22.

In early 2016, Bess was hired by Correctional Corporation of America, which operated D.C. facilities under a contract with DOC.  Id., ¶¶ 30–31.  The District ended its relationship with CCA in mid-2016 but offered direct employment to CCA's employees.  Id., ¶ 32.  Bess alleges that she was initially informed by DOC Human Resources officers that she was not eligible for reemployment, and she asked whether that was due to her participation in the Neal case.  See Def. SMF, ¶¶ 5–6.  Bess was ultimately given an offer, however, which she and at least four others accepted.  See Am. Compl., ¶ 33.  Since her rehiring as a correctional officer at CTF, she alleges that she has been subject to retaliation for her participation in the Neal suit, as well as for the filing of an internal EEO complaint in 2017, an EEOC charge in 2019, and this lawsuit in October 2019.  Id., ¶¶ 29–73; ECF No. 29 (Pl. Opposition/Cross-Motion for Summary Judgment) 3.  According to Bess, this retaliation has taken the form of, among other things,

unfavorable job assignments, denial of overtime opportunities, rude and disrespectful treatment by her supervisors, and a delayed promotion timeline.  See Am. Compl., ¶¶ 37, 41, 45–73.

Plaintiff thus filed this action in October 2019, alleging three counts: 1) "failure to assign overtime because of protected activity," 2) lower salary because of the same, and 3) "retaliatory hostile work environment," all in violation of Title VII and the DCHRA.  See ECF No. 1 (Complaint), ¶¶ 62–74.  In July 2020, Bess successfully amended her Complaint to add a failure-to-accommodate claim under the Rehabilitation Act.  See Am. Compl., ¶¶ 107–20.  According to Bess, who has diabetes, the District improperly denied her request to minimize her exposure to inmates likely to be COVID-positive.  Id., ¶¶ 74–93.

The District now moves for summary judgment on all four counts.  See ECF No. 28 (Def. Motion for Summary Judgment).  Bess filed an Opposition on the retaliation counts and a Cross-Motion for Summary Judgment on the failure-to-accommodate claim.  See Pl. Opp./Cross-MSJ.

## II.   Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  See Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or

presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The nonmovant is required to provide evidence that would permit a reasonable jury to find in her favor.  Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the nonmovant's evidence is "merely colorable or is not significantly probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249–50 (citations omitted).

When both parties move for summary judgment, the court shifts the beneficiary of the factual inferences.  Once it "determines that one party is not entitled to summary judgment, it changes tack on the cross motion and gives the unsuccessful movant all of the favorable factual inferences that it has just given to the movant's opponent."  Clark v. Vilsack, No. 19-394, 2021 WL 2156500, at *2 (D.D.C. May 27, 2021) (internal quotation marks omitted).  It is of course "possible for a court to deny summary judgment to both sides."  Id.  The Court will reach that result here on the Rehabilitation Act count.

### III.    Analysis

Bess brings two types of claims.  Counts I–III of the Amended Complaint allege that she was retaliated against for her protected activity, in violation of Title VII and the DCHRA.  See Am. Compl., ¶¶ 94–106.  Count IV alleges a failure to accommodate her diabetes and the increased risk of severe illness from COVID-19 in violation of the Rehabilitation Act.  Id., ¶¶ 107–14.  The Court considers these two issues separately.

### A.  Retaliation Claims

As claims under the DCHRA are analyzed under the same framework as those under Title VII, the Court will conduct the analysis for both simultaneously.  See Burley v. National Passenger Rail Corp., 801 F.3d 290, 296 (D.C. Cir. 2015) (plaintiff's Title VII and DCHRA claims "rise and fall together"); Bowie v. Gonzales, 433 F. Supp. 2d 24, 34 (D.D.C. 2006).

Title VII prohibits an employer from retaliating against an employee "because [the employee] has opposed any practice made an unlawful employment practice" under the statute. See 42 U.S.C. § 2000e-3(a).  In cases like this one, in which there is no direct evidence of retaliation, the Court must begin with the familiar three-part burden-shifting framework set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973).  See McGrath v. Clinton, 666 F.3d 1377, 1383 (D.C. Cir. 2012).  Under this framework, the plaintiff has the initial burden of establishing by a preponderance of the evidence a prima facie case of retaliation.

To do so, "a plaintiff must show: (1) that he opposed a practice made unlawful by [statute]; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action because the employee opposed the practice." Id. at 1380 (internal quotation marks omitted).  In cases where the defendant offers a legitimate, non-retaliatory reason for its decision, the court "need not – and should not – decide whether the plaintiff

actually made out a *prima facie* case under <u>McDonnell Douglas</u>." <u>Brady v. Office of Sergeant at Arms</u>, 520 F.3d 490, 494 (D.C. Cir. 2008). Instead, it simply looks at whether the employee has produced sufficient evidence for a reasonable jury to conclude that the asserted non-retaliatory justification for the action is a pretext for retaliation. <u>Guajacq v. EDF, Inc.</u>, 601 F.3d 565, 577 (D.C. Cir. 2010). In this case, however, Defendant does not offer a reason for any action or decision; instead, it relies on Plaintiff's failure to establish a *prima facie* case. In such circumstances, there is no <u>Brady</u> pretext issue to reach. <u>See</u> <u>Dudley v. Washington Metropolitan Area Transit Authority</u>, 924 F. Supp. 2d 141, 181 (D.D.C. 2013) (because defendant "attack[ed] Plaintiff's *prima facie* case directly," court did not need to consider question of pretext). The Court thus looks only at the *prima facie* question.

As a preliminary matter, there is no dispute that Bess engaged in protected activity that satisfies the first requirement of a *prima facie* case. The District acknowledges that her participation in the <u>Neal</u> lawsuit and her filing of the 2019 EEOC charge were protected activities. <u>See</u> Def. MSJ at 10–11. Bess identifies two additional potentially protected activities: the filing of an internal EEO complaint in 2017 and the filing of this lawsuit. <u>See</u> Am. Compl., ¶ 64; Pl. Opp./Cross-MSJ at 3. As Defendant does not challenge that these also qualify, the Court will assume that they do. Whether Bess is entitled to a remedy, therefore, turns on whether the District took materially adverse actions against her because of her protected activities.

Plaintiff alleges that the District retaliated against her in three ways: 1) by repeatedly denying her requests for overtime assignments, <u>see</u> Am. Compl., ¶¶ 94–97; 2) by not promoting her — or providing her the accompanying pay increase — at the same pace as her similarly situated coworkers, <u>id.</u>, ¶¶ 98–101; and 3) by subjecting her to a hostile work environment. <u>Id.</u>, ¶¶ 102–06. The Court considers each in turn.

1.   *Overtime Denials*

Start with overtime.  As of March 2020, Bess had been denied overtime shifts approximately 80 times by her estimate.  See ECF No. 29-2 (Pl. Opposition Statement of Material Facts), ¶¶ 11, 19.  She testified that Lieutenant Lancaster, Captain Marr, and Captain Bruce had all denied her overtime requests at various points, and that Marr specifically was responsible for approximately 30 denials.  Id., ¶¶ 11, 13–15; see also ECF No. 28-2, Exh. B (LaVern Bess Deposition) at 76:2–10.  Although she has worked some overtime shifts, Bess estimates that she has lost out on approximately $22,000 through the denials of her overtime requests and removal from the overtime schedule.  See Def. SMF, ¶ 38; Pl. Opp. SMF, ¶ 12.

To succeed on her retaliation claim, Plaintiff must first establish that the overtime denials constitute a "materially adverse action."  McGrath, 666 F.3d at 1380.  Defendant contends that they do not.  See Def. MSJ at 11–12.  "A retaliatory employment action is materially adverse if 'it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Robinson v. District of Columbia, 275 F. Supp. 3d 95, 105 (D.D.C. 2017) (quoting Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006)).  Courts in this district have found that "alleged denials of overtime opportunities" may satisfy this requirement "when those denials are associated with a fundamental alteration in the conditions of employment . . . and the plaintiff demonstrates that '[she] in the past sought opportunities for overtime pay.'"  Id. at 106 (quoting Caul v. U.S. Capitol Police, No. 15-1243, 2016 WL 2962194, at *9 (D.D.C. May 19, 2016)).  Whether overtime denials constitute an adverse action "is a fact-specific inquiry."  Id. at 105.

The Court believes that a reasonable jury could conclude that the denials of Bess's overtime requests constituted adverse employment actions.  There is no dispute that she "sought

opportunities for overtime pay" and thus made clear to her employer that she desired such an assignment.  Id. at 106 (citations omitted); Def. SMF, ¶¶ 19–25.  Whether the denials constituted a "fundamental alteration in the conditions of employment" is a closer question, but Bess has done enough to survive summary judgment.  A reasonable jury could determine that the loss of the benefits associated with overtime "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington Northern, 548 U.S. at 68 (internal quotation marks and citations omitted).  This is especially so given that Plaintiff estimates that she potentially lost over $22,000, a sum that could fundamentally alter the nature of her employment when the highest salary she earned during the relevant time period was approximately $59,000.  See Pl. Int. Resp. at 3; ECF No. 29-3, Exh. 47 (Pl. Initial Disclosures) at 3–4; see also Robinson, 275 F. Supp. 3d at 106 n.6 (collecting cases finding smaller sums actionable under Title VII).  Plaintiff, therefore, has at least created a disputed question of fact as to whether she suffered an adverse employment action.

For her to prevail, these adverse actions must also have a causal connection to Bess's protected activity.  Employees often establish this connection by demonstrating that "the employer had knowledge of the employee's protected activity, and the adverse personnel action took place shortly after that activity."  Mokhtar v. Kelly, 83 F. Supp. 3d 49, 81 (D.D.C. 2015), aff'd, No. 15-5137, 2015 WL 9309960 (D.C. Cir. Dec. 4, 2015) (quoting Pardo-Kronemann v. Jackson, 541 F. Supp. 2d 210, 218 (D.D.C. 2008)).  "[T]hat is not the exclusive method of showing a causal connection," however.  Walker v. England, 590 F. Supp. 2d 113, 139 (D.D.C. 2008) (citing Forman v. Small, 271 F.3d 285, 299 (D.C. Cir. 2001)).  Regardless of method, "the employee must proffer evidence from which a reasonable jury could infer the employer's

retaliatory intent." McGrath, 666 F.3d at 1383 (citing Montgomery v. Chao, 546 F.3d 703, 706 (D.C. Cir. 2008)).

Establishing this nexus poses a hurdle for Bess.  She fails to establish that either the 2017 EEO complaint or the 2019 EEO charge could have motivated the overtime denials.  For a start, many of the denials occurred before the 2019 charge.  See Am. Compl., ¶ 41.  More important, Bess proffers no evidence that Lancaster, Marr, or Bruce (or any employees outside the personnel office, for that matter) were aware of the filings of either of these complaints.  See ECF No. 34 (Def. Repl./Opp.) at 13–14.  Without knowledge of the complaints, these supervisors cannot have acted in retaliation for them.  See Holcomb, 433 F.3d at 903 (causal connection may be established by temporal proximity and knowledge).  Bess runs into a similar challenge with the Neal lawsuit, as she has not established that either Lancaster or Bruce was aware of her participation.  Nor does Bess mount any argument that her current lawsuit triggered overtime denials.  See Pl. Opp./Cross-MSJ at 17–18.

She is saved by her introduction of evidence that Marr told her that she remembered her from the protective list associated with the Neal case when they met.  See Pl. Int. Resp. at 6–7; ECF No. 29-3, Exh. 2 (LaVern Bess Deposition) at 68.  Plaintiff further asserts that Marr once "expressly referenced [Bess's] participation in the Neal case as a reason for the denial [of overtime]."  Pl. Opp. SMF, ¶ 14; see also Bess Depo. at 70–71.  Taking these facts in the light most favorable to Bess could allow a reasonable jury to infer a causal connection.  The Court will, accordingly, deny Defendant's Motion for Summary Judgment on Count I, but only as to Marr's denials of overtime, which occurred approximately 30 times.

2.   *Promotion/Pay Increase*

Bess next alleges that the District promoted and gave a pay increase to four similarly situated individuals but not to her.  See Am. Compl., ¶¶ 98–101.  Like all other officers who were hired by DOC when it ended its contract with CCA, Bess and the four comparators she identifies — M.A., D.B., S.P., and R.V. — entered at the same level.  See Def. SMF, ¶ 4; Pl. Opp. SMF, ¶ 6.  D.B. and R.V. told Bess that they had been promoted to Corporal in winter 2017, and Bess observed M.A. and S.P. wearing Corporal stripes in spring 2017.  See Pl. Int. Resp. at 16.  Bess, conversely, was not promoted to Corporal until September 2019.  See Def. SMF, ¶¶ 12—13; Pl. Int. Resp. at 3.  Based on conversations she had with some of the comparators, Plaintiff knew them not to have completed certain trainings typically required for promotion, which Bess herself had completed.  See Pl. Opp. SMF, ¶ 8; Bess Depo. at 128–32.  Bess attributes these differences in treatment to her participation in the Neal lawsuit, in which none of the comparators was involved.  See Am. Compl. ¶ 101; Pl. Opp. SMF, ¶ 7.  Bess thus argues that the promotion and pay differential constitute retaliatory actions.  See Pl. Opp./Cross-MSJ at 19–20.

As with her overtime-denial claim, Plaintiff must establish a causal connection between her protected activity and these adverse actions.  This she cannot do.  Because the comparators' promotions (and, presumably, the accompanying decisions not to promote Bess) occurred before the filing of either of her EEO complaints or of this lawsuit, the only relevant protected activity is Bess's participation in the Neal lawsuit.  See Def. SMF, ¶ 17 (EEOC Charge filed April 20, 2019); Pl. Opp. SMF, ¶ 22 (internal EEO complaint filed August 3, 2017); Compl. at 9 (lawsuit filed October 21, 2019).  Although Plaintiff alleges that such participation is the reason she was not promoted alongside her comparators, she offers no evidence that would allow a jury to draw this conclusion.  See Am. Compl., ¶ 101; Pl. Opp./Cross-MSJ at 19–20.

Acknowledging that such "evidence may be . . . circumstantial," <u>McGrath</u>, 666 F.3d at 1383, the Court still can find no causal connection.  The best Bess can offer is the fact that the comparators were not participants in the lawsuit and that she previously told some members of the District's Human Resources Department about her participation.  <u>See</u> Pl. Opp. SMF, ¶ 7; Pl. Int. Resp. at 6–7.  Yet, this evidence does not demonstrate that the individuals who made the promotion decisions had this knowledge; indeed, Bess has not even identified these decisionmakers.  A reasonable jury thus could not infer a causal connection between the decisions not to promote Bess at the same time as her comparators and her protected activity — especially when that protected activity occurred nearly 30 years prior.  <u>See</u> <u>Mokhtar</u>, 83 F. Supp. 3d at 81 n.22 ("Cases in this Circuit consistently have found a lack of causal connection when a year or more has passed between the protected activity and the alleged adverse action.").  Nor can Bess's allegation that the District had a retaliatory motive save her claim.  "Although, as a rule, statements made by the party opposing a motion for summary judgment must be accepted as true for the purpose of ruling on that motion, some statements are so conclusory as to come within an exception to that rule."  <u>Greene v. Dalton</u>, 164 F.3d 671, 675 (D.C. Cir. 1999).  Bess's allegation is one such statement.  The Court will, accordingly, grant Defendant's Motion on Count II.

### 3.  *Hostile Work Environment*

Finally, Bess alleges that the District retaliated against her by subjecting her to a hostile work environment in response to her protected activities.  "In this circuit, a hostile work environment can amount to retaliation."  <u>Hussain v. Nicholson</u>, 435 F.3d 359, 366 (D.C. Cir. 2006) (citing <u>Singletary v. District of Columbia</u>, 351 F.3d 519, 526 (D.C. Cir. 2003)).  To prevail on such a claim, a plaintiff must demonstrate that she was subjected to a series of adverse actions

that are "'adequately linked' such that they form 'a coherent hostile environment claim.'" <u>Baird</u> <u>v. Gotbaum</u> (<u>Baird II</u>), 792 F.3d 166, 168–69 (D.C. Cir. 2015) (quoting <u>Baird v. Gotbaum</u> (<u>Baird</u> <u>I</u>), 662 F.3d 1246, 1251 (D.C. Cir. 2011)).  "For example, they might 'involve the same type of employment actions, occur relatively frequently, and [be] perpetrated by the same managers.'" <u>Id.</u> at 169 (quoting <u>Baird I</u>, 662 F.3d at 1251)  Furthermore, the "cumulative effect" of "the acts must be 'of such severity and pervasiveness as to alter the conditions of . . . employment and create an abusive working environment.'"  <u>Id.</u> (quoting <u>Hussain</u>, 435 F.3d at 366).  Even when a plaintiff has established conduct that meets this standard, she will succeed on her retaliatory-hostile-work-environment claim only if she also "establish[es] a causal connection between the harassment and [her] protected activity."  <u>Peters v. District of Columbia</u>, 873 F. Supp. 2d 158, 189 (D.D.C. 2012).

Bess here points to numerous incidents that occurred between 2017 and the present.  <u>See</u> Am. Compl., ¶¶ 102–06; Def. SMF, ¶¶ 26–60; Pl. Opp. SMF, ¶¶ 20–38.  The acts fall largely into three categories.  First, many of the incidents involve disrespectful or rude treatment by her superiors.  For example, two officers used profanity at Bess, a different officer refused to accept equipment that she was required to return, and a third declined to provide batteries for Bess's flashlight and responded with "negative outbursts" when questioned about it.  <u>See</u> Def. SMF, ¶¶ 28, 30, 34–35, 50.  Second, Plaintiff points to instances in which she was treated differently from other correctional officers.  She was instructed to use only a specific bathroom and she was required to walk with a supervisor while others were not, among other things.  <u>Id.</u>, ¶ 31; <u>see</u> Pl. Opp. SMF, ¶ 36.  Third, Bess provides evidence that she was denied work opportunities or assigned to undesirable tasks.  For example, she asserts that since being certified to train other officers, she has been assigned to train only one officer; she is no longer called for Contraband

Interdiction Team (CIT) assignments and was not selected to participate in a training for CIT members; and she has been repeatedly reassigned to posts different from those she bid on and won without being notified of the reason for the reassignment.  See Def. SMF, ¶¶ 33, 39, 44–45. Included here, too, are the overtime denials that comprised Count I.  Bess also notes that she has been subject to disciplinary proceedings, including a proposed three-day suspension that was reduced to one day and later rescinded, and a reprimand in 2019.  Id., ¶¶ 26–27, 36–37.

These and the other constituent acts were perpetrated by ten different individuals, only some of whom were responsible for more than one alleged offense.  Id., ¶¶ 19 (Captain Sheila Marr, Captain Kevin Bruce, Lieutenant Crystal Lancaster), 26 (Captain Reginald Walker), 28 (Corporal Brian Warton), 36 (Captain Jesse Wilson), 39 (Corporal Burris), 44 (Captain Glinda Brown), 50 (Corporal Danielle Powell), 55 (Lieutenant Sanders).

While the events Bess describes may well have created an at-times-unpleasant working environment, they do not rise to an actionable level.  "To '[prevent] Title VII from expanding into a general civility code,' the Supreme Court has emphasized as 'crucial' the requirement that the behavior be 'so objectively offensive as to alter the conditions of the victim's employment.'" Peters, 873 F. Supp. 2d at 188 (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998)).  Even considered together, the acts Bess describes are not sufficiently severe and pervasive to constitute a hostile work environment.  See Tumblin v. Barr, No. 19-2204, 2020 WL 7078826, at *5–6 (D.D.C. Dec. 3, 2020).  Many appear to be manifestations of "lost tempers and workplace disagreements—the kind of conduct courts frequently deem uncognizable under Title VII."  Baird II, 792 F.3d at 171.  Critically, Bess has also failed to demonstrate that the acts are "adequately linked to one another."  Id. (internal quotation marks omitted).  The incidents she cites instead span four years and "involv[e] different people doing different things in different

contexts." Id.  Without a connection, these discrete incidents do not constitute a hostile work

environment, and "'[t]he sheer volume of [Bess's] allegations does not change' this deficiency."

Tumblin, 2020 WL 7078826, at *5 (quoting Baird II, 792 F.3d at 172).

Even if they were sufficiently severe, Bess would still come up short for an independent

reason: she has not established a connection between her protected activity and most of the

adverse acts.  See Nichols v. Truscott, 424 F. Supp. 2d 124, 141 (D.D.C. 2006) (rejecting hostile-

work-environment claim where plaintiff "failed to demonstrate a causal connection between the

harassment in question and her protected activity").  As discussed above, Bess has presented

evidence that Captain Marr knew of her participation in the Neal case and cited it as a reason for

her actions, allowing a jury to conclude that the overtime denials were a reaction to Bess's

protected activity.  See Pl. Int. Resp. at 6–7.  Bess also told Captain Brown about her participation

in the lawsuit.  Id.  She has not, however, introduced evidence to show that any other individual

who perpetrated a constituent act against her was aware of her participation in the Neal lawsuit.

Id.; Pl. Opp. SMF, ¶ 9.  And, as discussed above, she has not established that any individual

knew of her EEO complaints.  Nor has she shown that anyone was aware of the filing of this

lawsuit; in fact, though she cites it in her Amended Complaint, Bess makes no arguments

regarding this suit in her summary-judgment briefing.  See Am. Compl., ¶¶ 64–73; Pl.

Opp./Cross-MSJ at 21–22 (listing Neal case, 2017 EEO complaint, and 2019 EEOC charge as

triggers of retaliation).  As a result, all but the acts committed by Marr and Brown are therefore

"exclude[d] from consideration."  Peters, 873 F. Supp. 2d at 189 (citation omitted) ("It is

therefore important in hostile work environment cases to exclude from consideration personnel

decisions that lack a linkage of correlation to the claimed ground of [retaliation].").

Once the actions of others are subtracted from the analysis, Bess is left with far too little to clear the severe-and-pervasive bar.  The Court will therefore grant Defendant's Motion as to Count III.

B.  <u>Failure to Accommodate</u>

The Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*, requires federal employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A); <u>see</u> 29 U.S.C. § 791(f) (directing courts to apply standards from the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, to identify violations).  Bess alleges that the District violated this requirement by refusing to grant her reasonable request to accommodate her diabetes and the associated increased risk of severe illness from COVID-19.  <u>See</u> Am. Compl., ¶¶ 107–14.  Both sides have moved for summary judgment on this count.

To survive summary judgment, Bess must produce evidence sufficient to allow a reasonable jury to find that "(i) she was disabled within the meaning of the Rehabilitation Act; (ii) her employer had notice of her disability; (iii) she was able to perform the essential functions of her job with or without reasonable accommodation; and (iv) her employer denied her request for a reasonable accommodation of that disability."  <u>Solomon v. Vilsack</u>, 763 F.3d 1, 9 (D.C. Cir. 2014) (citations omitted).  The parties largely agree that the first three elements are satisfied.  Because the Court concludes that there are genuine disputes of fact as to whether Bess's requested accommodation was reasonable and whether the District denied her request, it will deny summary judgment to both parties.  It first recounts the relevant factual details, noting disputes where relevant.

1.  *Factual Background*

Bess suffers from diabetes, and the District was aware of this condition.  See ECF No. 29-1 (Pl. Cross-MSJ SMF), ¶ 1.  Believing that her diabetes puts her at an increased risk of severe symptoms if she contracts COVID-19, Bess asserts that she requested an accommodation from the District in May 2020.  See Def. SMF, ¶ 56.  That request was made verbally to Rosetta Taylor-Jones, the District's Management Liaison Specialist, who remembers Bess requesting "not to work in medical 82 and quarantine unit," ECF No. 29-3, Exh. 4 (Rosetta Taylor-Jones Deposition) at 40:16–17, though Bess describes the request as broader: "that she be accommodated by not being placed in locations that put her at risk of contracting COVID-19." Pl. Cross-MSJ SMF, ¶ 4.  At the end of June 2020, Bess's primary-care doctor, Dr. Imelda Miranda, submitted an accommodation request form that asked for "no performance of duties around people in isolation or quarantine for Covid-19."  ECF No. 37-1 (Health Care Provider Certification Form) at 3.  Taylor-Jones told Bess that her request would be granted and that a written decision would be issued.  See Pl. Cross-MSJ SMF, ¶¶ 12–14; ECF No. 28-2, Exh. G (Taylor-Jones Depo. Excerpts) at 41–42.

After receiving this verbal confirmation, Bess claims that she was still assigned to units under quarantine status.  See Pl. Cross-MSJ SMF, ¶ 18.  With one exception, these instances involved transferring inmates to or from quarantine units or covering breaks for officers stationed to work in those units; they did not involve Bess's being assigned to work primarily in a prohibited unit.  See Def. Repl./Opp. at 22; see also ECF No. 29-3, Exh. 3 at 2–4 (Oct. 20, 2020, Pl. letter to Taylor-Jones); Exh. 11 (July 10, 2020, Pl. letter to unspecified recipient); Exh. 12 (Aug. 5, 2020, Pl. letter to Taylor-Jones) at 2; Exh. 13 at 2–3 (Aug. 10, 2020, Pl. letter to Taylor-Jones); Exh. 14 (Aug. 14, 2020, Pl. email to Taylor-Jones and incident report) at 1–5; Exh. 15

(Sept. 16, 2020, Pl. letter to Taylor-Jones and lunch-relief assignment) at 1–4; Exh. 16 at 19–21,

27, 29–30, 34–35, 37 (Sept. 17, 2020; Oct. 25, 2020; Sept. 18, 2020; Oct. 23, 2020; Oct. 28,

2020 Pl. letters to Taylor-Jones); Exh. 17 (lunch-relief assignments) at 1–10; Exh. 26 (July 10,

2020, Pl. letter to unspecified recipient).  The District points out that, under its policy,

transferring inmates to or from a unit does not constitute an "assignment" to that unit, and it thus

disputes Bess's allegation that she was assigned to quarantine units.  See Def. SMF, ¶¶ 68–69.

On one occasion, however, Bess may have been assigned to a quarantine unit by Captain Bruce,

who testified that, if he did so assign her, he was unaware that he had done so.  See Def. SMF,

¶¶ 70–71; ECF No. 28-2, Exh. F (Kevin Bruce Deposition) at 47:6–8, 16–22.  Bess repeatedly

alerted Taylor-Jones to these alleged violations of her accommodation, but she asserts that she

did not receive responses.  See Pl. Cross-MSJ SMF, ¶¶ 22–55; Taylor-Jones Depo. Excerpts at

43–44.

On November 11, 2020, Taylor-Jones provided Plaintiff with a written decision on her

accommodation request.  See Pl. Cross-MSJ SMF, ¶ 56; Taylor-Jones Depo. at 96.  The decision,

which was dated October 27, described Bess's approved accommodation as "not being assigned

to work Medical-82 or Quarantine Units."  ECF No. 29-3, Exh. 3 at 5.  Bess, through counsel,

informed Taylor-Jones that she did not believe that this accurately reflected her requested

accommodation.  See Pl. Cross-MSJ SMF, ¶ 58.  Taylor-Jones acknowledged in her deposition

testimony that the November 11 letter failed to include a restriction on assignments to work in

isolation units in addition to Medical 82 and quarantine units.  Id., ¶ 61; Taylor-Jones Depo. at

96–98.  She had not yet communicated that additional restriction at the time of her December 4,

2020, deposition.  See Pl. Cross-MSJ SMF, ¶ 62; Taylor-Jones Depo. at 97–100.  Bess later

corresponded with Taylor-Jones's replacement, Paulette Johnson, and objected to Johnson's

description of the accommodation as "not to be assigned to Medical 82, Quarantine and Isolation Units."  Pl. Cross-MSJ SMF, ¶¶ 66–74.  According to Bess, the removal of the "to work" language implied that Bess could be instructed to work in those units as long as she was not formally assigned there.  Id.  Bess asserts that the District has not responded to this.  Id., ¶ 75.

Before moving to its analysis, the Court notes that the District contends that Bess improperly relies on emails and letters that are inadmissible hearsay.  See Def. Repl. at 17–18.  To the extent that she cites these documents to show that she gave the District notice that it was not accommodating her diabetes, they are not cited for the truth of the matter asserted, so the Court may consider them.  Yet, if Plaintiff wishes to admit these as evidence of the events they describe, this is likely hearsay.  In any event, ignoring these documents would not change the outcome here since, as discussed below, the dispute focuses on whether Bess's request was reasonable and whether the District sufficiently engaged in an interactive process.

2.  *"Disabled"*

As a preliminary matter, the Court acknowledges some disagreement between the parties about whether Bess's diabetes renders her "disabled" within the meaning of the Rehabilitation Act.  To meet the definition, an individual must have "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A); see also 29 U.S.C. § 705(20)(B) (defining individual with disability as one who would qualify under 42 U.S.C. § 12102).  "Major life activities" include "the operation of a major bodily function, including . . . endocrine . . . functions."  42 U.S.C. § 12102(2)(B).  Whether Bess's diabetes fits this definition is a bit unclear.  On one hand, regulations interpreting the statute include diabetes as an example of an impairment that "will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity."  29 C.F.R. § 1630.2(j)(3)(ii)–(iii) ("For

example[,] . . . it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: . . . diabetes substantially limits endocrine function."). On the other hand, this is an individualized inquiry, see Kapche v. Holder, 677 F.3d 454, 461–63 (D.C. Cir. 2012), and the District points to indications from Bess's doctor that her diabetes does not substantially limit her major life activities. See ECF No. 34-2, Exh. K (Dr. Imelda Miranda Deposition) at 30:20–22–31:1–7 (agreeing that Bess does not have medical condition that makes one or more major life activities difficult to perform); see also Health Care Provider Certification Form at 1 (Dr. Miranda checked "No" in response to question "Does this person have a medical condition, that makes one or more of his/her major life activity/activities difficult to perform?"). The Court need not decide this question because the District did not argue that Bess was not disabled within the meaning of the Act in its Motion. See Def. MSJ at 17–20; Armenian Assembly of America, Inc. v. Cafesjian, 924 F. Supp. 2d 183, 191 (D.D.C. 2013) ("The Plaintiffs forfeited this argument by failing to raise it in their initial motion."); see also American Wildlands v. Kempthorne, 530 F.3d 991, 1001 (D.C. Cir. 2008).

### 3.   *Denial of the Accommodation Request*

This leads us to the heart of the matter: whether Bess's request for an accommodation was reasonable and whether the District in fact denied it.

There is some dispute as to what her request actually was. She contends that she sought an accommodation of "no performance of duties around inmates in isolation or quarantine for Covid-19." Pl. Opp./Cross-MSJ at 12. Proper implementation of that accommodation would have required the District not to give Bess any tasks that involved contact with inmates in isolation or quarantine for COVID-19, including transporting inmates between units and covering breaks of officers assigned to the isolation and quarantine units. Id. at 11–15. The

District does not dispute that it did not grant this version of the accommodation, see Def.

Repl./Opp. at 21–22, but its refusal is only problematic if Bess's request was "reasonable."  See

Pauling v. District of Columbia, 286 F. Supp. 3d 179, 211 (D.D.C. 2017) (quoting Aka, 156 F.3d

at 1305 ) ("[A]n employer is not required to provide an employee that accommodation [s]he

requests or prefers[;] the employer need only provide some reasonable accommodation.").

A "reasonable accommodation" may include "[j]ob restructuring; part-time or modified

work schedules; reassignment to a vacant position; acquisition or modifications of equipment or

devices . . . and other similar accommodations for disabilities."  29 C.F.R. § 1630.2(o)(2).  The

D.C. Circuit has instructed that "[a]n accommodation may be unreasonable 'if it either imposes

undue financial and administrative burdens . . . or requires a fundamental alternation in the

nature of [the employer's] program.'"  Taylor v. Rice, 451 F.3d 898, 908 (D.C. Cir. 2006)

(quoting School Board of Nassau County, Florida v. Arline, 480 U.S. 273, 287 n.17 (1987)).

Assessing whether a proposed accommodation falls within this definition "is commonly a

contextual and fact-specific inquiry" and often involves assessing whether the accommodation

would remove essential functions from the employee's duties.  Solomon, 763 F.3d at 9.

Bess contends that her request was reasonable because "placement on a particular post is

not an essential job function of her position," and "relieving other officers of breaks in any

particular location, or escorting inmates to/from any particular location [are not] listed [as] major

duties in her position description."  ECF No. 38 (Pl. Reply) at 3–4.  Rather, the duties of a

corrections officer are to "enforce the regulations governing the operation of the [prison] facility,

serving as both a supervisor and counselor of inmates."  Id. at 4 (quoting ECF No. 32

(Correctional Officer Job Description) at 1 (alteration in original)).  The District counters that

Bess's duties include "perform[ing] security checks of the cells where inmates are housed or of

empty cells," "moving inmates throughout the building as needed," and "cover[ing] the breaks for officers, including in [the quarantine unit]." Def. Repl./Opp. at 21 (citing ECF No. 34-1 (Def. Repl. SMF), ¶¶ 82–83, 92). It therefore argues that she could not perform her essential functions if prohibited from coming into contact with inmates in isolation or quarantine for COVID-19. Id.

Granting all favorable factual inferences to the non-moving party, the Court concludes that both sides have put forth sufficient evidence to allow a reasonable jury to find in their favor, either by agreeing with the District that Bess's requested accommodation was unreasonable because it would prevent her from performing essential functions or by agreeing with Bess that it would not require a "fundamental alteration." Summary judgment is thus not appropriate. See Solomon, 763 F.3d at 12 (denying summary judgment where Plaintiff produced sufficient evidence that requested accommodation did not infringe on essential functions of job).

Bess next contends that the District violated the Rehabilitation Act by failing to engage her in the "interactive process" of fashioning a reasonable accommodation or by unreasonably delaying in granting the accommodation. See Pl. Opp./Cross-MSJ at 15–17. She cites evidence that the District's Human Resources officers did not provide a written decision on her accommodation request for six months and did not respond to her emails expressing that her supervisors were violating the accommodation to which the District had verbally agreed. Id. at 11–17. Bess also notes that, when made aware that the written accommodation did not align with her request, the District did not respond, and, even after acknowledging that the accommodation improperly omitted a restriction on work in isolation units, it never so informed her supervisors. See Pl. Cross-MSJ SMF, ¶¶ 61–62. The District rejoins that it engaged with

Bess in good faith, granted her request, and was justified in any delay given the COVID-19 pandemic.  See Def. Repl./Opp. at 22–24.

A Rehabilitation Act plaintiff can establish that her request was "denied" by showing "either that the [employer] in fact ended the interactive process or that it participated in the process in bad faith."  Ward v. McDonald, 762 F.3d 24, 32 (D.C. Cir. 2014); see also 29 C.F.R. § 1630.2(o)(3).  Courts may find that a party has denied a request in this manner when there are "signs of failure to participate in good faith or . . . to make reasonable efforts to help the other party determine what specific accommodations are necessary," when a party "obstructs or delays the interactive process," or when a party "fails to communicate, by way of initiation or response."  Ward, 762 F.3d at 32 (quoting EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 805 (7th Cir. 2005)).  Construing the evidence in the light most favorable to Bess, the Court concludes that she has done enough to defeat the District's Motion here.  As she notes, the city did not provide a written response to her accommodation request for six months, which is well outside the 15- to 20-day timeline in which it normally responds, see Pl. Cross-MSJ SMF, ¶ 16; the Human Resources officers did not respond to her repeated notifications that she believed her accommodation was being violated, id., ¶¶ 22–55; and the District admitted that it did not communicate an additional restriction it concedes should have been included.  Id., ¶¶ 61–62. From that evidence, a reasonable jury could find that the District did not participate in good faith in the interactive process.

Yet, viewing the evidence with the contrary inferences, the Court cannot award Plaintiff summary judgment.  The parties agree, for example, that the District approved an accommodation for Bess, and Defendant points to evidence that Taylor-Jones responded to Bess's complaints by confirming with the relevant shift supervisor that Bess needed to be

accommodated, which suggests a good-faith attempt by the city.  See Pl. Opp./Cross-MSJ at 11 (recognizing verbal approval of accommodation); Taylor-Jones Depo. at 44.  The District contends, furthermore, that any delay in providing the written accommodation or making changes to the granted accommodation at Bess's request was not unreasonable in the midst of a pandemic.  While Bess argues that Defendant has not introduced any evidence to support the last point, see Pl. Repl. at 8, both parties cite EEOC documents stating that the pandemic may result in excusable delays in responding to accommodation requests.  See Def. MSJ at 19–20 (citing EEOC, "Pandemic Preparedness" Guidance, Section III(B)(14) (no longer available)); Pl. Repl. at 7 (citing EEOC, What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws, Question D.17 (last viewed October 4, 2021), https://bit.ly/3moiGtx). A reasonable jury could decide, based on this evidence, that the District did sufficiently engage in the interactive process.

To the extent that Bess separately contends that the District functionally denied her accommodation because it did not comply with the terms of the accommodation it claims to have provided, that argument results from a disagreement between the parties about precisely what the District approved.  While Bess cites instances in which she was tasked with transferring inmates to or from COVID units and with relieving officers for breaks on those units, see Pl. Opp./Cross-SMJ at 11–15; Pl. Repl. at 6 n.3, the city responds that it approved Bess's request only not to be assigned to those units.  See Def. Repl./Opp. at 22–24.  Whether the District erred here thus turns on the same questions raised above: did it violate its obligations by granting Bess a more limited accommodation than the one she believes she requested, and did it fail to engage her in an interactive process by delaying clear communication of the approved accommodation?  At most,

Bess's argument reveals another disputed fact — namely, what accommodation the District verbally approved.

This lengthy discussion may be summed up with a simple conclusion:  Bess's Rehabilitation Act claim may proceed.  Material factual disputes remain as to whether her accommodation request was reasonable and whether the District failed to engage in the interactive process in good faith.  Those questions are best suited for a jury, and, accordingly, the Court will deny both parties' Motions.

## IV.    Conclusion

For the aforementioned reasons, the Court will grant Defendant's Motion for Summary Judgment on Counts II and III and will deny the Motion on Counts I and IV.  The Court will also deny Plaintiff's Motion for Summary Judgment on Count IV.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  October 15, 2021